Good morning. Good morning. May it please the court. My name is Jeffrey Feiner. I represent Syed Hasan. Your honors, there's two issues before the court this morning. The first one has to do with whether the lower court properly applied the summary judgment standards in dealing with cross motions in this employment civil rights case. I think it may be easier given the volume of the record in this matter to do an overview from some distance, at least at first, so that the court gets a sense of the difficulties the plaintiff has with the lower court's decision. And I'll turn to the lower court's decision. It's in that first volume of the ECR. And I will go through just for a few moments and indicate to where the three, three times. Page 4, eight times. Page 5, four times. Page 6, twice. In fact, you have to read over a dozen pages, Your Honor, before you get to a single fact alleged by the non-moving party in the summary judgment. The trial court here relied on its motion for summary judgment on the moving party's facts and turned the standard. We're going to do, but we have the record here. So, I mean, a lot of things are going to be de novo for us here. Right? Sure. So, you know, I see a couple, I mean, the issues that, you know, when you look at, this is, this goes on a long time, obviously, and it's been to court many times. And a number, in a number of arbitrations, your client's been successful throughout the years as well. But you've got an 11th Amendment issue that's before the court. Second issue, yes. And then you've also got to deal with Morgan in terms of showing a discrete act within the statute of limitations in order to bring everything else in. Not everything, Your Honor. I have a number of events that occur within the statute of limitations. Well, you've got to show a discrete act if you want to end within the statute to get, to get past Morgan. And the court said you didn't, right? Well, as to that portion that was outside the statute, that's what the court said. However, Your Honor, we alleged a number of events that are within the statute of limitations. Well, what are the discrete acts? Within the statute? Within the statute of limitations. A number. And let me go through with my notes. They occur when Christensen, who is the chair of the DPC, the Departmental Personnel Committee, determines arbitrarily to change the rules with respect to Professor Hassan. No other professor under her responsibility is required to meet the standards that she imposes for the FAP, Faculty Activity Plan. She says she treated him equally, and the defense argues that she did so, but we have record citations indicating she applied a formatting rule that no one else had. She had a page limitation rule no one else had. And when she was asked to be, to, when my client asked that her bias be reviewed, because she had previously said that my client was. Well, but wait a second. Everything in terms of discrete acts tends to be, you know, it's got to be like you fire someone, you know, or if it's a hostile work environment, that's certain in terms of that, you know, I mean, you're talking about, you know. Discrete penalties as opposed to the run-up acts? I can discuss those. Well, I don't think, you know, a discrete act that he has a different page requirement or, I don't understand exactly what you're saying there. I've never heard that to be a discrete act. Certainly. Let me explain. The discrete acts that occur within the statute of limitations involve his penalization on the occasion where they determined that he refused to teach a class. This was in an ongoing turmoil over whether this was a legitimate class, it had no one signed up for it, experimental, but he refused, and he was wrong to do so. However, in fashioning the penalty for that, the arbitrator, whose binding arbitral decision said that the university was unreasonable, that Mr. Hassan reasonably relied on his dean and on his department chair's statements to him, that he did not have to do those formats, that he did not have to follow Professor Christensen's unique requirements. And when he relied on his dean and on his department chair, she still rejected his FAP. And as a consequence, that disturbance as recognized in the binding arbitration by Kavanaugh, my client reasonably understood that he was not being treated on the same ground as other faculty. So at the next point, when they impose a penalty on him for refusing to teach a class, the arbitrator said it was an unreasonable penalty. Now the defense says, well, we never imposed it, it was barred by arbitration. And I beg to differ. They did impose it, and then they stayed its operation pending the arbitration. They claimed, well, there's no harm then, because he reversed this in arbitration. We're coming to court on three EEO complaints that were retaliated against. Within days of his EEO complaints, this nonsense begins. We have shown that in the past, in 2003 when he had a suit against his employer, a gargantuan claim was concocted against him for abuse of a student, all of which disappeared. And that this has been the pattern there, as I show in the voluminous record, for 42 years. How many other people do they have that are tenured professors that didn't finish their dissertation? We only know of two, himself and Professor Shapiro. Professor Shapiro was given credit for his conference papers. Professor Hassan was not given credit for his conference papers. There's a dual standard at that university in this record. And that's why we came to court. The judge below thought we came to court over First Amendment right to speak issues. I don't even know where that comes from, except the defense argued that, and the lower court accepted it. But Your Honors, although it is de novo, and the lower court's opinion can be set aside, I will still indicate that the non-moving party, Professor Hassan, gets the benefit of the facts he's alleged and those reasonable inferences that flow from those facts. He's had no benefit of any of the facts or the reasonable inferences. Well, on the retaliation, though, isn't that a burden-shifting test? So doesn't he say something, then they give why they did what they did, and then doesn't he have to go back and put something else on? Correct, except where we have binding arbitral decisions. In a 1983, 1981 context, those arbitration rules are precedental. They are the law. And we know that this university never took the records out, as they were ordered to do, by the Duffy arbitration. We know that they overreacted and penalized my client excessively. That's in the Kavanaugh arbitration decision. Your Honors, if we only looked at the arbitral decisions, we would see a basis for a reasonable belief that there was retaliation. That's a jury question. Why don't you address the Eleventh Amendment issue? Yes, please. Because it appears that there may be, that your client may have waived the argument because he failed to raise it except in a very cursory manner in his survey applied to defendant's motion for summary judgment. I think that's fairly put. That is the issue. When the university brought up the waiver question, excuse me, when they brought up the Eleventh Amendment issue, they did so in a single line with no argument. They just said, the university is exempt. And it's because of the Eleventh Amendment immunity. A single line. We wrote back, you've made no showing whatsoever what the FISC is that's being protected, that there are any state of funds going in. You haven't made a prima facie argument. Then in their reply brief, they brought in a single affidavit that said, if Professor Hassan would win, then it would affect the state treasury. All right. So now they've made their prima facie at the reply. To this point, there has been three or four lines in 10,000 pages of text. So at that stage, I provided to the court by supplemental authority, consistent with the rules in this circuit for addressing issues that are brought up in a reply brief. Because it's not until a reply brief that they've even made their case. And I brought up a statute in Washington that says... I guess we're using a little different words because they, well, it's sort of their answering and then the reply is you, are you talking briefs or, yeah. I'm speaking of the briefs below. Okay. Where they raised it in a single sentence and I said, they made no factual assertions to show that this was a state institution. So I guess, is your argument that raised, that what I described as somewhat a cursory manner in your reply brief is sufficient to establish that you did not waive this argument? Correct. Okay. Well... Under the rules in my circuit, I was entitled to make a response to an issue raised in a reply brief. All right. You also claimed that the district court erred in failing to consider Mr. Hassan's complaint. Did you even plead hostile work environment? With those specific terms, those terms do not appear in the complaint. Neither does the Fourth Amendment. Summary judgment is framed by the complaint. How can the district judge be wrong in failing to address something that isn't even in the complaint? Oh, because I don't need to put a legal theory in a complaint. Under Rule 8, all I'm required to do is put set forth facts that are not speculative, that can be established from the record, and that form a basis for relief. And so, if it's a requirement now, under Rule 8... Even that's without ever talking about hostile work environment? You just have to have facts there that things were unpleasant for him without ever alleging that it was hostile work environment? I think the term need not be used in a Rule 8 complaint. I don't think the Rule 8 requires specificity in naming legal theories. The court said I didn't raise a Fourth Amendment issue as well, and yet there's paragraph after paragraph about the surreptitious taking of his computer and the use of his computer data to scuttle his claim in 2003. Well, was there anything said about the, even in the facts, about the work environment being hostile? From the complaint itself or from the motion for summary judgment materials? Because I will agree, the complaint raises that there was a consistent practice of using two standards. Well, what the complaint alleges are discrete discriminatory acts during the statute of limitations periods rather than a succession of acts amounting to a single wrong. And so, you don't maybe have to use the words hostile work environment, but you've got to put all of them together and say that there's a single wrong. Which is why the complaint went back to 1968 and traced the 42 years of this professor's struggle with the university. If you want to have any rebuttal time, you might want to reserve at this point. I'm mindful that we're running low. The issues are before you, and I will have a short rebuttal. Thank you. Good morning. May it please the court, counsel. My name is Amy Clemmons. I represent the respondents Eastern Washington University and the individually named defendants. It's very clear in the opening brief in this matter that there are two remaining issues that are contending occurred within the statute of limitations. One, the level of discipline that was issued in the fall of 2007. And two, an issue of what exists in his personnel file. Clearly in the summary judgment argument, when the district court asked, where is there some record in this matter that would indicate that there were some materials that should have been removed from his personnel file. In response to that, Mr. Hassan's attorney said, well, there's nothing in the record. And that entire transcript is part of the record today. There was nothing that was ever brought to the attention of anyone at Eastern Washington University that there was something in his personnel file that needed to be removed. The only evidence in this record is that Mr. Hassan in his declaration says, I went in, I looked at my file, and I copied it. At no point in time do they put a fact in this record that here's what's in his file that shouldn't have been. Here's somebody that should have removed it and didn't. He doesn't identify any act related to any of the individually named defendants relating to this alleged record issue with his personnel file. The facts don't exist in the record. The only other issue raised in the opening brief is this discretionary disciplinary decision by Provost Mason. And what's important about that is he's not saying it was inappropriate to discipline him. At this point in the record, it's clearly acknowledged that he engaged in intentional misconduct. He was insubordinate. The provost directed him that under the collective bargaining agreement, you're required to teach 36 credit hours. You outright refused to do that. Well, and it came down to if you publish, you can teach less. And if you don't publish, you have to teach another class, right? That occurred in the FAP process, which is the plan. So between October of 2006 and April of 2007, they were trying to encourage him to publish because if he published within that time frame, they could have reduced his schedule for the fall of 2007. Mr. Hersonen's deposition realized that that was an amicable process, was the term he used, with Dean Fuller and the then provost at the time, which was not Provost Mason, and that they came to an agreement because he didn't publish, he was required to teach 36 credit hours. He felt the application of the collective bargaining agreement was unfair to him because he does not feel publication should be important. But he's challenging the policies, not any individual for acting inappropriately. He agrees Dean Fuller was nice to him. He agrees Dean Fuller was acting in good faith, and there's no question it was Dean Fuller that implemented his schedule. Despite it being made in good faith and pursuant to the collective bargaining agreement that he's required to teach 36 credit hours, he outright refused. When he outright refused, Provost Mason was brand new. He started in July of 2007, was not involved in the history, had no past information, had no bias. And this record is very clear that he had no bias. Mr. Hassan, in the arbitration in January of 2009, concedes in his written materials into the arbitrator, at ER 768, that he was acting in good faith, that I'm not saying that either Provost Mason or Dean Fuller did anything wrong. The other thing that's important is the Eastern District of Washington has Local Rule 56, which requires you to set forth specific facts by paragraph number, and then respond to them, each in turn, by that paragraph number. If they are not controverted in that process, they're considered admitted. That's exactly what the district court followed, is that local rule, because when you look at Mr. Hassan's statement of material facts, the LR 56, it is ER 413 to 430. That's his opportunity to put facts in the record. There's not one fact in his statement that indicates Provost Mason was acting with ill will. There's not one fact in that statement that Provost Mason was influenced by anyone else who was acting with ill will. In addition, when you look at the interrogatory responses, which are at ER 354 to 60, and at 366, Eastern Washington University asked a very open-ended question. Identify any and all facts that support your claim for liability in this case. Again, in response to that very broad question, tell us everything you're claiming supports your cause of action. He does not identify any ill motive by Provost Mason. He does not identify any problem with the level of discipline issued. He does not identify any facts that someone influenced Provost Mason. By the time this was argued at summary judgment, his entire argument was based upon the premise that because he arbitrated this agreement, and the arbitrator decreased the level of discipline because the arbitrator agreed he was insubordinate. The arbitrator agreed that it was intentional knowing this conduct by Mr. Hassan because he'd been warned eight times that you do not have the right to refuse to perform your contract. And the other thing that's very important about the arbitration is Provost Mason, when he came in with this, with his good faith, simply wanted to hear it before the classes started so that they wouldn't have this problem. The only reason for the delay is Mr. Hassan refused to show up for two meetings before the classes started. He claimed that he had to have a specific union representative, not just any union representative, and that union representative was in Italy. So he wanted the hearing continued until after classes started. Provost Mason then directed him, okay, if it's going to get continued until later, at your request, I'm directing you show up and teach the course until I can hear your concerns. And when you look at Provost Mason's testimony, which is at ER 522 to 647, he says, my concerns were I couldn't find any reason for him not to teach it. When I sat down to talk to him to find out why he was refusing to teach it, he refused to answer any questions. Mr. Hassan provided a brief written statement that I feel 36 credit hour assignment is unlawful, period. I refuse to say anything further. Provost Mason said, I don't understand. You're going to need to explain it to me. And Mr. Hassan never would. So Provost Mason said, even on top of that, I don't understand why you couldn't show up and have taught it until we could have had this hearing. In addition to that, when you look at the record, not only is there nothing that would allow him to refuse to perform his contract, his own union representatives and his own private counsel, as noted in the arbitration decision, were telling him he had no right to refuse to teach and that he should show up and teach. So in this record, what you have is intentional misconduct. You do not have... Is the main insubordination the refusal to teach the class? Yes. There were two parts to it. It was not just the refusal to teach the class, but it was also the refusal to teach the class until it could be heard. So there was a directive from Dean Fuller that he must teach 36 credit hours, and then there was a separate directive from Provost Mason that he at least teach it until Provost Mason could hear the matter. And then I... Why isn't that our major concern? You're mentioning a lot of other things. The fact that he was requested to teach the class and he didn't do it. That is the primary concern. That's the one issue here. There's no question that discipline is an adverse action, but the problem with the retaliation claim is it has to be correlated to some protected activity. There is not one fact in this record that correlates the discipline in response to his intentional misconduct to some protected activity at any point in time. If you look at ER 413 to 430, they don't even say what they're attributing it to. In addition to in the interrogatories and in the statement of material facts, paragraph 193 to 195, which is at ER 1525 to 26, they concede Provost Mason was acting in good faith with a clean slate. In argument at summary judgment, SER 36 to 38, they say he's acting in good faith. So what they're not saying is that he shouldn't have been disciplined. They concede discipline was appropriate. The arbitrator conceded discipline was appropriate. What they're saying is that Provost Mason's discretionary decision to determine what the appropriate level of discipline is wasn't somehow too severe. That solely because the arbitrator reduced the level of discipline, that that in and of itself somehow infers an improper motive. And the district court looked very thoroughly at this record, and it is an extensive one because they definitely tried to put a smoke screen to the past to say that something was done wrong somewhere. So everybody should take a second look at it. But they do not identify one fact of an improper conduct within the statute of limitations, nor do they identify one fact that would link Provost Mason's legitimate decision, admittedly legitimate decision, to some protected activity. So what they're saying is it's not that he was disciplined that's the adverse act. It was the setting the level of discipline. And the other thing that's interesting is this is not a Title VII claim. It's a Section 1981 claim. And under Section 1981, what you're required to do is show an impairment of your contract, an actual impairment to your contract. His contract allowed him to arbitrate that decision. He had every right to do so. He got his arbitration, and the only discipline imposed was the discipline set by the arbitrator. The district court was right on point when he said there is not any fact in this record that would indicate Provost Mason setting a disciplinary level that's appropriate for serious misconduct, was in some way motivated by any improper motive. And when you look at ER 768, that was Mr. Hassan's written statement to the arbitrator in January of 2009. And he says, I'm not accusing him of any discriminatory or retaliatory animus. In response to our motion for summary judgment, they did not set out a fact claiming that someone else's animus. There's nothing in the briefing. The first time they mentioned a cat's paw theory is actually an oral argument. And in oral argument, which is at SER 36 to 38, the district court stops them and says, well, let me know where this is in the record. They don't answer that question because there's nothing in the record. What they say is, he may have been influenced by somebody. But the record in this case is clear that Provost Mason made the decision on what the appropriate level is by himself. Santa Christensen was not involved at the decision. Hermione Steenhouse, the chair of the department, was not involved in the decision. Dean Fuller provided him a timeline just as to the progress of when he was assigned the class, how long he knew about the class, and things of that nature. So the testimony was that Provost Mason considered three things. His interview with Hassan, the fact that Hassan could not come up with any reason to not teach it, the fact that Mr. Hassan failed to follow Provost Mason's directive. And that he could not find any reason why he couldn't have taught it until the hearing. That that was serious misconduct. There's nothing in this record that Provost Mason got information from somebody who was acting with any kind of ill motive. So you're basically saying they didn't present any evidence after you gave a legitimate reason for doing what you did. Absolutely. And that's their requirement in the burden of proof under the shifting burden. They can't just say, I have a theory that's unsupported by fact that maybe he was influenced. They have to come forward with substantial and specific evidence. Just out of curiosity, let me ask you, aside from the matter of that issue in this case, what's the relationship between the plaintiff and the university now? He continues to teach. He's just a regular teacher without any outstanding issues? He's a regular teacher. There have not been any new claims or suits or anything filed. He continues to teach 36 credit hours and has not published since 1993. But is the university still requiring him to publish? The collective bargaining agreement and the college plan require all faculty to publish in order to meet certain qualifications. And he's subject to those exact same qualifications. The one thing I do want to correct is they keep referring to he was held to a dual standard. And they mention a Mr. Shapiro. What they're referring to is a dispute that occurred in 1998 over whether he could meet the graduate faculty list requirement. The record addressing Mr. Shapiro is at ER 1275 to 1283. That dispute has nothing to do with what happened in 2006. Mr. Shapiro left after that. But an arbitrator addressed the dispute that Mr. Hassan submitted that I, there were two individuals who didn't have doctorates. Mr. Hassan wanted to be on the graduate faculty list but had no publications and no conference proceedings. And he didn't qualify. Mr. Shapiro did not have a doctorate. He had 17 scholarly activities. And in the record, it says they were predominantly conference proceedings, not exclusively. So the record doesn't say how many peer-reviewed articles they were. Just that out of the 17 publications he had, they were predominantly conference proceedings. But what the arbitrator said is they were held to the exact same standard. Here's somebody with 17 scholarly activities and here's somebody with none. That's the reason for the difference that one qualifies for the graduate faculty list and one does not. And in 1999, when that was arbitrated, the arbitrator found it was clear and convincing that Mr. Hassan was not held to a different standard. Mr. Shapiro has since left the university. So how does that, what is that, what is the relevance to that, this motion? It's not relevant at all. They throw in something that he's held to a dual standard, inferring that that's some issue within the statute of limitations and it's not. All right. Well, I just was wondering as to, so you're basically, you were correcting what he said. Correct. But not, you're not maintaining that it's relevant to the analysis during the statute of limitations period. It's not. The one issue raised within the statute of limitations is Provost Mason setting a level of discipline. They conceded that 36 is correct. They conceded that all the disputes on the FAP process related to him being required to teach 36 credits and that there was no impact of the FAP process on him at all other than for him to teach 36 as he was required. All right. You basically have 17 seconds. So you need to wrap up. Their total theory is that Provost Mason was influenced by a mid-level manager. That simply doesn't exist in this case. Admittedly, Provost Mason acted in good faith and there's nothing in the record to dispute that. All right. Thank you for your argument. Thank you. Current relationship. It's off the record, but I'm going to address it since council was allowed to address it. My client is back on the graduate faculty. He has published a number of peer-reviewed articles and the university has patched that up with him. I do not know why council is not in contact with her client. I will provide those materials to the court on that. It's not going to influence this. Very well. Secondly, the records were not removed. We didn't make some vague statement. We specifically said the records ordered to be removed had not been removed. I don't know what needs to be clear. They wanted to know what records were referring to. What needs to be clear is who was responsible for that and who didn't do that. We don't know who didn't. We know who entered the records. How can you pin it on these defendants? I don't pin everything on these defendants. I pin that on the particular defendant who inserted those records into his file, who took his computer, and who scuttled his 2003 lawsuit. It's not that person's responsibility to remove it, is it? I don't know that to be the case and nor have they said otherwise. You don't know that. How can you sue them for not removing it if you don't know if he's responsible for removing it? Because the individual who put in action this problem has not corrected it, and that's who was ordered to remove it. She was the party to that arbitration. I urge this court to do what the lower court did not do, which is to read the Duffy and Kavanaugh arbitration decisions. They are binding. If they were not binding, Your Honors, I would not have brought this suit. I think they're evident, but I don't think they're binding. I disagree with you on that, but go ahead. Well, I briefed it. It's the Tennessee case. It's in my brief. Next. Encouraged by email. In ER 372, 373, the dean and the department chair specifically tell my client, you don't have to do Christensen's format changes. You're fine. Submit it as is. You'll get your reduced hours. He did as instructed. He got no reduced hours. Next point. It was stated here a moment ago that Hassan refused to answer questions. He had provided several written pages of his specific complaints. When he arrived and the union representative was laid in tow, he said, it's in my writings and all of that's in the record. So rather than standing mute or being defiant, he said, I've written it down. You're in your last 30 seconds, so you need to wrap up. The last point is Christensen said, and the court got this quote wrong, I was married to this Iranian. You guys are tricky and deceptive. That is a patently racial or cultural or national origin remark. The lower court eluded the remark, took out the you guys, made it sound like it was some abstract comment. My client has been under Ms. Christensen's thumb for the last 14 or 15 years. When he said she's biased, the university said, oh, and they turned to Dr. Christensen and said, you're biased. There was no standard of fairness applied to Mr. Hassan. Thank you. All right. Thank you both for your argument. This matter stands submitted. Last matter on calendar for argument today is the Scott's Company v. Seeds Inc., 11-35235.
judges: Hug, Tashima, Callahan